UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMONN KNOTT,

                Petitioner,                Case No. 2:22-cv-12081
                                                    Hon. Mark A. Goldsmith

v.

JOHN DAVIDS,[1]

                Respondent.
_____/

## OPINION & ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (Dkt. 1), (2) DENYING A CERTIFICATE OF APPEALABILITY, AND (3) DENYING PERMISSION TO APPEAL IN FORMA PAUPERIS

LaMonn Knott, a Michigan prisoner, filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. Knott challenges his Wayne Circuit Court jury trial conviction of first-degree murder, Mich. Comp. L. § 750.316; armed robbery, Mich. Comp. L. § 750.529; felon in possession of a firearm, Mich. Comp. L. § 750.224f; felony-firearm, Mich. Comp. L. § 750.227b; second-degree arson, Mich. Comp. L. § 750.73(1); and mutilation of a dead body, Mich. Comp. L. § 750.160. Knott was sentenced to mandatory life for the murder conviction and lesser terms for the other offenses. Knott's habeas petition raises four claims challenging his convictions, but because the state court adjudication of his claims was consistent with clearly established Supreme Court law, the petition will be denied.

### I. BACKGROUND

Knott's convictions stem from the robbery and murder of Gabriel Vasquez. Vasquez's girlfriend, Rachel Karas, testified at trial that on the morning of April 7, 2016, Vasquez received

---

[1] The Court substitutes the current Warden of Petitioner's correctional facility as Respondent. See Habeas Rule 2(a), 28 U.S.C. § 2254.

1

a call on his cellphone. As Karas handed Vasquez's phone to him she saw that the call was coming from "Rock." Karas knew Knott as "Rock," someone she met when she went with Vasquez to complete a drug deal. Tr. at 75–77, 89, 103 (Dkt. 10-12).

After the call, Vasquez counted out $12,000 in cash and left in his truck. He returned home later that afternoon with five pounds of marijuana and most of his cash. Id. at 94–99, 121. Karas believed that Vasquez had purchased the marijuana from Justin Covent. Id. at 78–80, 94–99. Vasquez then went into the basement, grabbed an additional pound of marijuana, and then left again in his truck with all six pounds. Id. at 78–81, 96–97.

Covent testified that Vasquez arrived at his house around 4:30 p.m. on April 7, 2016. Tr. at 41 (Dkt. 10-15). Covent said that Vasquez "pulled out a fat wad of cash" from his pocket and paid him $800. Id. at 49–50. While there, Vasquez received a telephone call. Covent heard Vasquez say: "Rock, I'm trying to come as fast as I can." Id. at 48. Vasquez left Covent's house between 5:00–5:15 p.m. Id. at 49.

At 8:02 p.m. on April 7, 2016, the Detroit Police Department received a 9-1-1 call reporting a house fire. Tr. at 27 (Dkt. 10-13). Shortly thereafter, Officer Krishrion Scott received a call to investigate a dead body at 9558 Ward in Detroit. Dkt. 10-12 at 126. When Scott arrived at the address, the fire department had already extinguished the fire. Id. at 125. Scott discovered a partially burnt body behind the front door, later identified as Vasquez. Id. at 126.

Police technicians arrived at the scene and recovered two .40 caliber shell casings and a fired bullet inside the house. Id. at 134–135. One of the victim's pockets was turned inside out and empty, and the jewelry Karas said Vasquez was wearing that evening was missing. Id. at 143. Vasquez's pocket tested positive for blood and contained his own DNA. Tr. at 126–127, 143–144

(Dkt. 10-13). Knott's DNA was not found on samples taken from the body. Id. at 143–145. An autopsy showed that Vasquez had been beaten and shot five times.

Two gasoline canisters were recovered from the kitchen area of the house. Tr. at 155–162 (Dkt. 10-12). Officers subsequently went to a Citgo Gas Station located a few blocks away and obtained surveillance video. The video depicted two men at the gas station before the fire. One if the men bought two gas cans, filled them, and walked in the direction of the house where the fire was set. Tr. at 46–49 (Dkt. 10-14). Officers retrieved a new gas can sold at the station, and it was subsequently determined to be the same brand and model as those found at the scene. Tr. at 82, 100–101 (Dkt. 10-15).

On the morning of April 8, 2016, Karas went to Vasquez's father's apartment to tell him that Vasquez was missing. Karas used an application on her cellular telephone to track Vasquez's phone. The application indicated that his phone was at an address where she and Vasquez had previously met Knott for a drug deal. Tr. at 82–89 (Dkt. 10-12).

On April 9, 2016, Detroit Police Sergeant Samuel Mackie canvased the area of the fire and interviewed Joe Osborne. Osborne said that he was near the house that was set on fire and had seen a burgundy Chevy van in front of the house. Osborne saw at least two men get out of the van, go up the driveway, and then get back into the van. About twenty minutes after the van left, he saw that the back of the house was on fire. Osborne told Mackie that he believed he had seen the same two men at an area liquor store earlier that evening. Tr. at 159–165, 185–191 (Dkt. 10-13).

Osborne testified under a witness detainer. At trial, he denied that he saw anyone going into the house before the fire and did not remember seeing a vehicle parked in front of the house. Osborne did not remember speaking with the police but admitted the signature on the written

3

statement looked like his. He said he did not want to testify and was only doing so because he had been arrested. Tr. at 85–100 (Dkt. 10-13).

On April 11, 2016, Karas met with a detective who showed her a photograph from Knott's Facebook page, and she identified him as "Rock," the person who Knott was going to see about a marijuana transaction. Tr. at 84 (Dkt. 10-12); Tr. at 87–88 (Dkt. 10-15).

On May 25, 2016, Knott was arrested and interviewed by detectives. Knott admitted that he knew Vasquez but said that he had not seen or spoken to him since March 2016. Knott was positive that he was not in the area of the fire on April 7, 2016. When confronted with the fact that Vasquez's cellphone had received numerous calls from his number on that date, Knott explained that he had a new phone number. Knott claimed that it was "a hell of a coincidence" that his old number had called the victim on April 7. A detective showed Knott a photograph depicting two men inside the Citgo gas station on the evening of April 7, 2016, who purchased two gas cans. Knott denied being either of the men in the photograph even after being told the phone number associated with him had called the other man in the photograph, co-defendant Scott Odum. Tr. at 7–10 (Dkt. 10-14) (recording played for jury).

While the case was pending, Knott admitted to Charles Sabo, a defense investigator, that he had purchased two gas canisters at the Citgo gas station on April 7, 2016. Knott claimed, however, that he put the gas cans in a detached garage located at a house on Glastonbury. Police officers later retrieved gas cans from the garage. While at the address, a detective observed a burgundy van parked in the driveway. Tr. at 142–148, 172–173 (Dkt. 10-15).

Stan Brue, a contractor with the Detroit Police and a former special agent with the ATF, testified as an expert witness in cellphone data. Brue analyzed the Vasquez and both defendants' cellphone records for the hours of 4:00–9:00 p.m. on April 7, 2016. According to Brue's analysis,

4

the victim and Knott's phones exchanged multiple calls between 4:03 p.m. and 7:18 p.m., with the last communications occurring near the scene of the eventual fire. Communications were also recorded between Knott and his co-defendant in the same area and timeframe. At 7:18 p.m. all activity involving the three phones was routed to voicemail, suggesting that the phones had been simultaneously powered off. At 8:02 p.m., the 9-1-1 call was made regarding the fire. A short time after the fire, both Knott and his co-defendant's phones made calls from the same area. Tr. at 43–57 (Dkt. 10-13).

Following closing arguments and instructions, the jury found Knott guilty as indicated above.

After he was sentenced, Knott filed a direct appeal. His appellate counsel filed a brief on appeal that raised five claims:

> I. The jury verdict is against the great weight of the evidence as there is no evidence that Mr. Knott was actually at the crime scene but there is substantial evidence that there was two other unknown persons at the crime scene.
>
> II. The trial court reversibly erred when it found that Mr. Covent was an unavailable witness after a due diligence hearing and allowed the preliminary exam testimony of Mr. Covent to be incorporated into the record in violation of Mr. Knott's sixth amendment confrontation rights.
>
> III. The trial court erred in denying Mr. Knott's request for a Daubert hearing on the scientific validity of Mr. Brue's findings and anticipated trial testimony as it is not the role of the jury to determine if Mr. Brue's findings are scientifically valid.
>
> IV. The prosecutor failed to present constitutionally sufficient evidence to convict Mr. Knott on all charges.
>
> V. Mr. Knott's trial counsel denied Mr. Knott his sixth amendment right to the effective assistance of counsel when he failed to request from the prosecutor and police a copy of the surveillance video from the liquor store, when he let the jury hear portions of Mr. Knott's recorded statement to the police that contained information about his criminal and prison history, and when he failed to object to the introduction of Mr. Knott's phone records.

The Michigan Court of Appeals affirmed in an unpublished opinion. People v. Knott, No. 341418, 2020 WL 1170813 (Mich. Ct. App. March 10, 2020). Knott subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising what now form his two habeas claims as well as a few additional claims. The Michigan Supreme Court denied the application by standard form order. People v. Knott, 959 N.W.2d 485 (Mich. 2021) (Table).

## II. LEGAL STANDARD

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15–16 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405–406 (2000)).

"[T]he 'unreasonable application' prong of [the statute] permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme

malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103 (punctuation modified).

### III. ANALYSIS

### A.

Petitioner's lead claim asserts that insufficient evidence was presented at trial to establish his identity as one of the perpetrators. Additionally, while it is unclear whether he presents the argument here, Knott also asserted on direct appeal that he is entitled to a new trial because the "great weight of the evidence" went against the verdict.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In Re Winship, 397 U.S. 358, 364 (1970). The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979). This inquiry, however, does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Id. at 318–319 (punctuation modified). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis omitted). More importantly, a federal habeas court may not overturn a state-court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution

7

of that claim. Instead, a federal court may grant habeas relief only if the state-court decision was an objectively unreasonable application of the Jackson standard. See Cavazos v. Smith, 565 U.S. 1, 2 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Id. Indeed, for a federal habeas court reviewing a state-court conviction, "the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality." Coleman v. Johnson, 566 U.S. 650, 656 (2012). A state court's determination that the evidence does not fall below that threshold is entitled to "considerable deference under [the] AEDPA." Id.

After reciting the constitutional standard, the Michigan Court of Appeals summarized the circumstantial evidence presented at trial that allowed the jury to find beyond a reasonable doubt that Knott was one of the perpetrators:

> Knott's argument on appeal focuses on the lack of direct evidence that he was the person who committed the robbery, murder, and subsequent burning of the victim. As noted, however, identification of a defendant as the one who committed a crime can be established solely by circumstantial evidence. Id. In this case, the prosecution presented an abundance of circumstantial evidence that Knott committed the crimes in question. Knott admitted in his interview with police that he knew the victim for many years. Knott acknowledged that, at some point in the past, he and the victim worked together selling marijuana. On the day in question, Karas saw that Knott called the victim. She believed that Knott requested to purchase marijuana, which comports with Knott's own description of his relationship with the victim. Similarly, Justin Covent, the victim's friend, knew that the victim and Knott were sometimes in business together, and that on the day in question, the victim was seeking marijuana to sell to Knott. Both Karas and Covent understood that when the victim left their presence he was on his way to meet Knott.
>
> Knott's and the victim's cellular telephone records further confirm that the two were speaking on the day of the crime. The records show that they spoke on numerous occasions between 4:00 p.m. and 6:21 p.m. Those same records also place Knott in the area of the crime scene beginning at 5:53 p.m., and show that the victim was traveling toward the crime scene at least by 5:56 p.m., because his cellular telephone pinged a tower between his home and the scene of the crime. According to the cellular telephone records, the victim continued to move toward

the crime scene, because at 6:08 p.m., his phone pinged a tower even closer to the crime scene. For that call, the victim spoke with Knott, who again was in the vicinity of the crime scene. Following that conversation, Knott then called Odum six times in a row, all of which went to voicemail. When Knott finally reached Odum, both of their cellular telephones pinged the tower in the area covering the crime scene. Shortly thereafter, at 6:21 p.m., the victim called Knott a final time, during which the victim's cellular telephone pinged the tower immediately next to the crime scene, and Knott's cellular telephone pinged the tower for the crime scene. From that evidence, a reasonable juror could infer that Knott had contacted the victim, asked the victim to meet him on Ward Street in Detroit, and then enlisted Odum's help to eventually rob and murder the victim.

Agent Brue testified that the evidence indicated that all three cellular telephones were pinging off of towers near the crime scene and then likely were powered off. Thus, the evidence supported the inference that the three men were together because their phones were all pinging near the same location, and then all had their telephones powered off. Accordingly, Knott had the opportunity to commit the crimes and "[e]vidence of opportunity is logically relevant in a prosecution for murder." People v. Unger, 278 Mich. App. 210, 224 (2008).

The circumstantial evidence supporting those inferences was further bolstered by the gas station surveillance camera footage. The footage showed that at about 7:17 p.m., Knott and Odum arrived at a Citgo gas station located just a few blocks from the scene of the crime. They arrived on foot, walked into the store, and pointed toward an area behind the cash register where gas cans were sold. Odum then purchased cigarettes and walked outside and off toward the crime scene. Knott went back into the store, purchased two gas cans, went outside to a pump, filled those gas cans with gasoline, and then walked off in the same direction as Odum. After about 35 minutes, someone called the police regarding a fire at the scene of the crime. When police and firefighters arrived to investigate, the victim's body was found. He had been shot five times, his front left pants pocket had been turned out, his wristwatch was missing, there was no marijuana or cash in the house, and his body had been partially burned. The police also found two gas cans in the kitchen of the partially burned residence. Police investigation later determined that those gas cans were the same brand that was sold at the Citgo gas station. The arson inspector determined that the fire was set on purpose, one of the sites of origin was the victim's body, and that an accelerant—gasoline—was used.

Later, during a conversation with Karas, Knott acknowledged that he planned to meet with the victim on the day of the crime, but stated that the victim did not show up. Then, during his police interview, Knott denied being in the area of the crime and claimed that he had not spoken to the victim since March. His representations to police contradicted his Facebook conversation with Karas. Also, during his interview, Knott refused to identify himself in the gas station surveillance footage, only agreeing that the man looked like him. Yet, about one year after the crime, in March 2017, Knott told a private investigator hired for his defense that

9

the gas cans he purchased in the surveillance footage were in a garage owned by his family on Glastonbury Street in Detroit. Therefore, Knott tacitly admitted to being the man in the video, despite repeatedly denying it and claiming he was nowhere near the area of the crime scene on the day in question. "Conflicting statements tend to show a consciousness of guilt, and a jury may infer consciousness of guilt from evidence of lying or deception." People v. Dixon-Bey, 321 Mich. App. 490, 509-510 (2017) (brackets, citations, and quotation marks omitted).

In summary, Knott knew the victim, purchased and sold drugs with the victim in the past, was in contact with the victim on the day of the crime, was the last person to speak to the victim, was in the same vicinity as the victim, had his cellular telephone turned off at the same time as the victim, purchased gas cans and gasoline near the scene of the crime less than an hour before a fire was reported, lied about being in the area of the crime scene, and lied about being the man purchasing gas cans in the surveillance video. As noted, Knott's identity as the perpetrator could be established by evidence that is entirely "circumstantial and sometimes requires reliance on an inference founded on an inference ...." Bass, 317 Mich. App. at 264. Further, it is the function of the jury to make those inferences on the basis of the evidence presented, and it is not for this Court to "resolve anew." Davis, 241 Mich. App. at 700. The jury considered the evidence, circumstantial though it might have been, and determined that Knott was the person who lured the victim to the house on Ward Street, robbed him, killed him by shooting him five times, and then attempted to burn his body and the house by using the gasoline he purchased just down the street. As established, those inferences by the jury were supported by Knott's clear opportunity to commit the crimes, Unger, 278 Mich. App. at 224, and the fact that he lied about his whereabouts and his identity in the surveillance video, Dixon-Bey, 321 Mich. App. at 509-510.

Accordingly, the inferences made by the jury in establishing Knott's guilt were well-founded. There was abundant circumstantial evidence that supported Knott's identity as the perpetrator of the crimes in question because "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." Hardiman, 466 Mich. at 428.

Knott, 2020 WL 1170813, at *3–*5 (footnotes omitted).

The state-court decision reasonably applied the Jackson standard. The state court accurately recited the evidence presented at trial and summarized the circumstantial evidence tending to indicate Knott's identity. First, Knott acknowledged a prior relationship with the victim, along with their prior involvement in drug transactions. On the day of the crime, Karas and Covent

separately heard the victim speak on the phone with Knott about completing a drug transaction. Phone records confirmed extensive communications between Knott, his co-defendant, and the victim, and they tracked the three men's movements to the location of the crime scene. The presence of all three men's cell phones near the same tower, followed by a simultaneous power-off, strongly suggested that they were together at the time of the crime.

Furthermore, surveillance footage from the gas station, viewed most favorably to the prosecution, showed Knott and his co-defendant purchasing gas cans and gasoline and walking in the direction of the scene. Shortly thereafter the fire was reported, and the gas cans found at the scene matched the ones sold at the gas station.

Inconsistencies in Knott's statements to police contributed to the case against him. Knott initially denied being in the area and said he had not spoken to the victim in months. But phone records contradicted this claim. Furthermore, while Knott initially refused to identify himself in the gas station video, through a private investigator he later tacitly admitted that he was the person in the video and claimed that the gas cans he bought there were the ones stored in his garage and not the ones found at the scene.

The prosecution thus presented a web of circumstantial evidence, including the testimony of the victim's girlfriend and friend, phone records, gas station surveillance footage, and Knott's own contradictory statements, to establish beyond a reasonable doubt that he was one of the perpetrators. The substantial circumstantial evidence establishing Knott's identity supports the state court's sufficiency determination far beyond "the threshold of bare rationality." Coleman, 566 U.S. at 656.

Finally, Knott's assertion that the verdict went against the great weight of the evidence fails to state a federal claim. "[A] claim that the verdict was against the weight of the evidence presents

a state law issue which is not cognizable on habeas review." Ponds v. Vashaw, No. 20-cv-11155, 2022 WL 891627, at *5 (E.D. Mich. Mar. 25, 2022); see Nash v. Eberlin, 258 F. App'x 761, 764 n.4 (6th Cir. 2007) ("[A] manifest-weight-of-the-evidence argument is a state-law argument."). Federal habeas relief is not available to correct errors of state law. See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Thus, Knott's great weight of the evidence claim is not cognizable under federal habeas and therefore lacks merit.

B.

Knott's second claim asserts that his rights under the Confrontation Clause were violated when Covent's preliminary examination testimony was admitted into evidence. He asserts that the prosecutor failed to demonstrate a good-faith effort in locating and producing Covent at trial.

The Sixth Amendment to the United States Constitution provides, "[I]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford v. Washington, 541 U.S. 36, 61 (2004), the Supreme Court held that the Confrontation Clause bars the admission of out-of-court testimonial statements made by an unavailable witness and offered for their truth if the defendant did not have an opportunity to cross-examine that witness.

When, as here, the prosecution seeks to introduce prior testimony that is subject to Crawford's limitations, a showing must be made that the witness is unavailable. A showing of unavailability involves two parts: First, the missing witness's testimony must have been given at a previous judicial proceeding against the same defendant and subject to cross-examination by the defendant. Second, the government must have made a "good faith effort to obtain [his] presence at the trial proceedings." Hamilton v. Morgan, 474 F.3d 854, 858 (6th Cir. 2007). "A good-faith

effort, however, is not an ends-of-the-earth effort, and the lengths to which the prosecution must go to obtain a witness generally amount to a question of reasonableness." Pillette v. Berghuis, 408 F. App'x 873, 881 (6th Cir. 2010) (punctuation modified).

Knott does not dispute that Covent's prior testimony satisfies the first requirement for admission. He asserts only that no good faith effort was made to obtain Covent at trial. The Michigan Court of Appeals rejected the claim on the merits:

> Detective Johnell White testified that he initially was able to serve Covent personally for his appearance at the preliminary examination. However, before the preliminary examination occurred, Covent "ran into some issues in his life," and Detective White had to make contact with Covent through an attorney. Nonetheless, Covent appeared and testified at the preliminary examination. When the prosecutor issued the subpoenas in July for the August 29, 2017 trial date, the detective attempted to contact Covent at his home address, but to no avail. Additionally, he tried all available phone numbers for Covent, but they were out of service. Covent had appeared at the preliminary examination in light of his relationship to the victim's family. Therefore, Detective White sought assistance from the victim's family to locate Covent, but they only "heard" that Covent went to Florida and they did not have an address or phone number for him. Consequently, Detective White reached out to another lawyer who represented Covent in Oakland County for recent drug charges. The detective learned that Covent did not remain in contact with his Oakland County attorney, and a bench warrant was issued for Covent's arrest. Detective White contacted the county prosecutor's office and the task force for information regarding Covent's whereabouts. He also used three different law enforcement tools, but he did not contact other jails or hospitals. He was unable to pursue social media searches because Covent did not appear to have any such accounts. The prosecutor, as an officer of the court, also made a statement on the record of his contacts with Covent's defense attorneys and the Oakland County Prosecutor's Office that corroborated Detective White's testimony. Specifically, after Covent's arrest for drug charges, the prosecutor learned that Covent initially maintained contact with his defense attorneys and appeared in court, but ultimately, a bench warrant was issued for his arrest for nonappearance, and his counsel could not reach him. The trial court found that reasonable efforts were made to secure Covent and allowed the preliminary examination transcript to be read to the jury.
>
> In light of the trial court's factual findings, we cannot conclude that the admission of the preliminary examination transcript constituted an abuse of discretion. In the context of securing witness presence, due diligence means the attempt to do what is reasonable, not all that is possible to obtain the presence of the witness. People v. Eccles, 260 Mich. App. 379, 391 (2004). Under the circumstances presented here, there is no error requiring reversal.

13

Knott, 2020 WL 1170813, at *14.

The state-court decision reasonably applied the settled Supreme Court standard. The trial court heard the evidence presented by Detective White regarding his efforts to locate and produce Covent for trial. Covent apparently was facing his own criminal charges and was evading authorities. Knott asserts that more could have been done to locate Covent, but such an argument does not speak to the reasonableness of the state court's determination that good faith efforts were made. "[G]ood faith efforts are context-specific," requiring the government to go to "reasonable lengths ... to locate, contact, and arrange to reasonably transport the witness." Hamilton, 474 F.3d at 859. The Supreme Court has noted that "when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." Hardy v. Cross, 565 U.S. 65, 71–72 (2011) (punctuation modified). Significantly, "the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken." Id. at 72.

On the record before it, the Court concludes that the prosecution and law enforcement made at least good faith efforts to locate Covent and secure his presence at trial. See Pillette v. Berghuis, 408 F. App'x 873, 882 (6th Cir. 2010). Although the prosecutor or police could have taken additional steps to secure Covent's presence, AEDPA's deferential standard of review requires this Court to accept the Michigan Court of Appeals' reasonable rejection of Petitioner's claim.

C.

Knott's third claim asserts that the trial court erred in admitting Brue's testimony regarding cellphone tracking. Knott argues that the prosecutor failed to establish that Brue's testimony was

the product of reliable principles and methods. He notes that there is no certification for Brue's claimed expertise, and that there is a lack of peer-reviewed literature on the issue. The Michigan Court of Appeals determined that the trial court nevertheless properly admitted Brue's expert opinion testimony under Michigan Rule of Evidence 702, and that the trial court did not err in failing to hold a pre-trial hearing on the issue. Knott, 2020 WL 1170813, at *14–*16.

The admission of expert testimony in a state trial presents a question of state law that does not warrant federal habeas relief, unless the evidence violates due process or some other federal constitutional right. See Keller v. Larkins, 251 F. 3d 408, 419 (3d Cir. 2001). Thus, a federal district court cannot grant habeas relief on the admission of an expert witness's testimony in the absence of Supreme Court precedent that shows that the admission of that expert witness's testimony on a particular subject violates the federal constitution. See Wilson v. Parker, 515 F.3d 682, 705–706 (6th Cir. 2008).

In state court, Petitioner relied primarily on Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and the associated state law cases applying Daubert's holding to support his claim that Brue's testimony was inadmissible. However, the Supreme Court's holding in Daubert involves the application of the Federal Rules of Evidence, which are not relevant to determining the constitutionality of a state-court conviction. See Norris v. Schotten, 146 F. 3d 314, 335 (6th Cir. 1998); Anderson v. Jackson, 567 F. Supp. 2d 973, 983 (E.D. Mich. 2008) (explaining that the Daubert decision concerning the admission of expert testimony was concerned with the Federal Rules of Evidence and, thus, did not apply to state criminal proceedings). Accordingly, Knott is not entitled to habeas relief on this claim.

D.

Knott's final claim raises several allegations of ineffective assistance of trial counsel. He asserts that his counsel was ineffective for failing to investigate and obtain the surveillance videotape from the liquor store where Osborn claimed to have seen the men he later saw at the scene of the fire. Knott speculates that the videotape would have shown someone other than him and his co-defendant. He also asserts that his counsel failed to move to suppress the portion of his interview with police that referred to him having a criminal record. Finally, he asserts that his counsel failed to object to Brue's testimony regarding cellphone tracking.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for determining whether a habeas petitioner received ineffective assistance of counsel. First, a petitioner must show that counsel's performance was deficient. Id. at 687. This requires showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. Second, a petitioner must establish that counsel's deficient performance prejudiced the defense. Id. This requires showing that counsel's errors were so serious that they deprived the petitioner of a fair trial or appeal. Id.

As to the first element, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" to prove deficient performance. Id. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. Id. at 689. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy. Id. at 689. As to the second element, a petitioner proves prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at

16

694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. Id. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." Id. at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by Strickland and 2254(d) are both highly deferential, . . . and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (punctuation modified). "When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

Here, after reciting the familiar standard governing claims of ineffective assistance of counsel, the Michigan Court of Appeals denied the claim on the merits as follows:

> Knott first argues that his counsel was ineffective for failing to request and obtain surveillance video from the liquor store across the street from the Citgo gas station. Knott contends that this video would have shown Osborne in the liquor store with two men. Considering Osborne's testimony that he saw two men near the scene of the crime on Ward Street and then again at the liquor store near the Citgo station, the video would have confirmed that Knott and Odum were not the two men who committed the crimes. Rather, it was the two men in the video at the liquor store. As Knott readily acknowledges, there is no factual predicate for his claim. Specifically, there is no evidence on the record that the liquor store in question has surveillance footage, whether it was or is available, or that the surveillance footage would have shown what Knott contends it would. The burden is on Knott to establish the factual predicate for his claim, which he has failed to do. Cooper, 309 Mich. App. at 80.
>
> Knott also argues that his counsel was ineffective for failing to ensure that portions of Knott's interrogation video—in which he admitted to spending time in prison for previous charges—was not played to the jury. Knott argues that evidence revealing his past prison sentences was improperly admitted under MRE 404(b).

>Once again, Knott has not presented any proof that the challenged portions actually were played to the jury. Indeed, the record in the case establishes the opposite, with both the prosecution and Knott's attorney acknowledging that the video would be muted or fast forwarded at certain portions. As noted, because this issue is unpreserved our review is limited to "mistakes apparent on the record." Johnson, 315 Mich. App. at 174. Considering the state of the record, as just summarized, Knott has failed to establish the factual predicate for his claim because he is arguing that errors occurred that are not "apparent on the record." Carbin, 463 Mich. at 600; Johnson, 315 Mich. App. at 174.
>
>Next, Knott argues that his trial counsel was ineffective for failing to object to the cellular telephone logs used by Agent Brue. Knott insists that the cellular telephone records for his telephone were incomplete and would have showed that he spoke to many other people besides the victim and Odum and likely pinged towers not near the crime scene. Once again, Knott has not provided any proof that his telephone logs were incomplete. Knott also failed to present any evidence that even if the logs were incomplete, that the new entries on the log would have been helpful to his case. Thus, because Knott has failed to establish a factual predicate for his claim that trial counsel failed to object to the incomplete nature of the telephone records, Knott's argument on appeal must fail. Cooper, 309 Mich. App. at 80.

Knott, 2020 WL 1170813, at *17–*18.

This decision did not unreasonably apply clearly established Supreme Court law. As for Knott's claim regarding the surveillance video, he made no evidentiary proffer to the Court of Appeals that the liquor store video existed and would have been available to defense counsel had he investigated the matter. Nor did he proffer any evidence to support his claim that such a video would have shown someone other than him and his co-defendant at the store. Given the lack of proffered evidence in support of the claim, the state court reasonably applied Strickland. The state court's "treatment of the spotty record in this case was consistent with [the Supreme Court's] recognition that 'the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.'" Dunn v. Reeves, 141 S. Ct. 2405, 2407 (2021) (quoting Burt v. Titlow, 571 U. S. 12, 23 (2013)).

The state court reasonably rejected the other allegations of deficient performant on a similar basis. The state court noted that the record was consistent with the prejudicial portions of Knott's statement to police having been fast-forwarded or muted when the statement was played for the jury. There was no record evidence of the jury having heard that Knott was a convicted felon. Similarly, Knott failed to proffer any evidence that cellphone records would have shown that he was in other locations besides the area of the crime during the relevant time period. In the absence of a proffer of evidence in support of Knott's allegations, the state court reasonably found that Knott failed to meet his burden under Strickland.

As none of Knott's claims merit relief, the petition for writ of habeas corpus will be denied.

## IV. CERTIFICATE OF APPEALABILITY

Before Knott may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Knott must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (punctuation modified). The Court finds that reasonable jurists would not debate the resolution of any of Knott's claims. The Court will therefore deny a certificate of appealability.

The Court also finds that because any appeal of this order would be frivolous, permission to appeal in forma pauperis will likewise be denied. Fed. R. App. P. 24(a).

## V. CONCLUSION

Accordingly, the Court (i) denies with prejudice the petition for a writ of habeas corpus, (ii) denies a certificate of appealability, and (iii) denies permission to appeal in forma pauperis.

SO ORDERED.

Dated: October 10, 2024             s/Mark A. Goldsmith
       Detroit, Michigan            MARK A. GOLDSMITH
                                              United States District Judge